In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3731

ROY A. SMITH,

*Petitioner-Appellant,*

*v.*

RICHARD BROWN,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:05-cv-00590-JTM — **James T. Moody**, *Judge.*

ARGUED APRIL 8, 2014 — DECIDED AUGUST 26, 2014

Before POSNER and TINDER, *Circuit Judges*, and LAWRENCE, *District Judge.*[*]

TINDER, *Circuit Judge*. Roy A. Smith appeals the district court's denial of his habeas petition, through which he seeks to set aside his Indiana criminal conviction due to allegedly ineffective assistance of counsel. Although we agree that it

[*] Of the United States District Court for the Southern District of Indiana, sitting by designation.

appears Smith's counsel was particularly deficient, Smith has failed to demonstrate how his lawyer's substandard effort prejudiced his case in light of the overwhelming evidence against him. We therefore affirm the district court's judgment.

## I. Background

The incident underlying this appeal occurred on March 19, 2003, when Smith was already serving a 90-year sentence for murder in the Indiana State Prison. That morning at breakfast, Smith walked behind a fellow inmate, Anthony Fisher, and stabbed him several times with half a pair of scissors. Fisher suffered wounds to the neck, back, and chest. He required surgery and remained in the hospital for twelve days. Smith's attack was observed by several guards, who promptly detained him.

Facing charges for attempted murder and aggravated battery in LaPorte County Superior Court, Smith received a court-appointed public defender named James Cupp. Soon after the appointment, Smith himself composed numerous motions to the court, which Cupp believed were meritless and therefore did not file. These attempted motions included, for example, a challenge to the integrity of the arrest warrant because the copy Smith received did not have a signature on it. Smith then tried to submit a motion to change attorney, and sent a letter to Cupp detailing his frustrations and Cupp's failure to communicate with him. But during a subsequent pretrial hearing on December 23, 2003, Smith decided not to request a change of counsel, saying that he was "going to give it another shot as long as I can get my motions filed timely and he kind of abide[s] by my wishes."

The attorney-client relationship did not improve. The court held another pretrial hearing on April 23, 2004, during which Cupp questioned Smith on the record so that he could essentially argue in support of his self-drafted motions. At the end of that proceeding, Smith again requested to have another attorney appointed. On May 6, the court issued an order denying all of Smith's motions, including his request to change his attorney. At the next hearing, on June 4, Cupp informed the court that Smith had filed a disciplinary complaint against him with the Indiana state bar. He represented to the court that the complaint had already been dismissed. He also noted that Smith wished to file an interlocutory appeal of the court's denial of his motions, but Cupp declined to move for a continuance to allow such an appeal. Smith, for his part, again informed the court of his frustration with Cupp's decision not to file his desired motions and his alleged refusal to communicate with him. In fact, he claimed that "I haven't discussed anything with Mr. Cupp in 11 months" and that Cupp had "done absolutely nothing" to assist in Smith's defense in that time. Smith also waived his right to a jury trial. Shortly after the June 4 hearing, Smith filed a motion on his own to remove Cupp and proceed pro se, along with a new motion to dismiss the indictment.

A bench trial commenced on June 22, but Smith sought a continuance. He claimed he had not received notice of the court's May 6 order denying his earlier motions until two days before the June 4 hearing, and that therefore he had been unprepared to promptly challenge the court's rulings. Moving on to his motion to dismiss the indictment, he argued that the trial court judge was not neutral because he had already made the probable cause determination underlying his arrest. He further stated that he wanted to call wit-

nesses and present evidence at trial, but that Cupp had refused to pursue those leads. In pleading with the trial court, Smith stated that "I don't know what [Cupp is] going to do" at trial because "[h]e refused to communicate with me. Since we [have] been in this courtroom, he hasn't said two words to me. … If he represents me I don't have a defense." The court denied Smith's remaining motions, and the trial proceeded.

Cupp gave an opening statement setting forth the theory that the stabbing was "self-defense to avoid [Smith's] annihilation" at the hands of the victim, Fisher. The state then called Fisher to the stand. After initially refusing to swear to tell the truth, Fisher declined to name his attacker and was otherwise unhelpful to the state's case. On cross-examination, Cupp questioned Fisher about an argument between the two men the day before the stabbing. Smith interjected by asking rhetorically, "You my lawyer?" Cupp continued, asking Fisher if he had told Smith the day before the attack that "Mr. Smith had defied [Fisher] for the last time." Fisher admitted that he had said this. Cupp then tried to get Fisher to admit that he had stated his intention to kill Smith the following day. Fisher denied saying so, and offered to testify to what he did tell Smith. However, Cupp did not press the issue, and instead promptly ended the cross-examination.

The state then called Derrick Judkins, a correctional officer at the time, and he testified that he saw Smith stab Fisher. Specifically, he testified that he saw Smith "walking in the [prisoners' dining room], and he did not proceed to follow around to get his tray. He just went in to where the tables were and proceeded to attack the inmate." He further

testified that Fisher's back was to Smith when he first struck, and that Smith had approached him from behind. Judkins testified that he at first thought Smith was striking Fisher with his fist, and did not realize Smith had a weapon until after the two men were separated and the half pair of scissors was found underneath the table. The prosecution then showed Judkins a photo of the half-pair of scissors found under the table near the stabbing. Cupp objected to the admission of the exhibit, but the court overruled the objection because the photo was not being offered into evidence; the witness was simply being asked to identify the item in the photo. Cupp chose not to cross-examine Judkins.

The state called a second correctional officer present during the incident, Kenneth Rutland. He testified that he responded to the attack in the dining room and grabbed Smith's right arm to prevent him from striking Fisher again. He stated that "that's when a piece of a pair of scissors fell out of his hand." He later admitted that he did not know that the object that fell out of Smith's hand was a piece of scissors until it was later recovered under the table. He also conceded that he had not witnessed the start of the attack. Rutland further provided the detail that Smith was wearing black gloves on both his hands at the time he was handcuffed. Cupp did not cross-examine Rutland.

The state then called a third correctional officer, Mike Chlebowski. He testified that after the attack he recovered the piece of scissors from under the table, along with a loose black glove that had also fallen to the floor. He further testified that, following a strip search, authorities discovered the other half of the scissors and the matching glove in Smith's pocket. Cupp declined to cross-examine him as well.

The state then called two witnesses who were not present during the incident. One of them was a prison investigator named Charles Whelan, who testified that he found Smith's prison identification card on the blood-spattered portion of the floor. Cupp did not cross-examine Whelan or the last witness, a nursing supervisor who testified as to Fisher's medical records and condition following the attack. Cupp did not call any witnesses either, over his own client's interjection that "Yes we do [have evidence]. And I got witnesses I'd like to call." He instead made a very brief closing argument, which we reproduce in its entirety: "Judge, I'd simply leave it to the Court's discretion as to whether the case has met its—the State has met its burden with respect to both Counts One and Two. That's all we would have. Thank you." The court promptly rendered a verdict finding Smith guilty of attempted murder and aggravated battery. The aggravated battery conviction was later vacated because it was a lesser included offense that merged with the attempted murder conviction. True to form, Cupp did not provide any arguments in mitigation during the sentencing phase of the proceeding. The court sentenced Smith to 34 years in prison, to be served consecutively to his current term.

Smith obtained direct review in the Indiana court of appeals, claiming ineffective assistance of counsel. The court held that "[d]efense counsel did not, for all practical purposes, mount a defense on Smith's behalf" because he cross-examined only one witness and called none in defense, while objecting only to one potential prosecution exhibit. The court concluded that "[w]e cannot characterize defense counsel's representation as 'effective.'" Nevertheless, it affirmed Smith's conviction because he failed to show any prejudice resulting from Cupp's performance in light of the

strength of the eyewitness testimony against him. Smith then petitioned for a transfer to the Supreme Court of Indiana, but transfer was denied.

In September of 2005, Smith prematurely sought habeas relief in the United States District Court for the Northern District of Indiana; the district court stayed the petition so that he could exhaust his remaining state remedies. He petitioned for post-conviction relief in Indiana state court, and appealed its denial to the court of appeals. There he argued that his appellate counsel's representation was ineffective. The court of appeals affirmed the post-conviction court's denial of his petition, but also observed in passing that "this court has already found Smith's trial counsel to have been ineffective."

The district court then lifted the stay and considered Smith's habeas petition. Cupp did not submit any evidence to the district court explaining his decisions during the litigation or describing his trial strategy. The district court acknowledged that the state court of appeals had found his trial court counsel to be ineffective, but held that the court reasonably concluded that Cupp's behavior did not prejudice Smith. Absent such prejudice, Smith's habeas petition could not succeed under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d). (Smith had also raised a claim—denied on direct review in state court and pressed in the district court as part of the habeas proceeding—disputing the trial court's denial of his motion to proceed pro se. The district court rejected that argument as well, and that issue is not before this court.) On May 30, 2013, we granted Smith a certificate of appealability recognizing that he had "made a substantial showing" that he was

denied his Sixth Amendment right to effective assistance of counsel. *See* 28 U.S.C. § 2253(c).

## II.    Discussion

"We review a district court's judgment regarding habeas relief de novo." *McElvaney v. Pollard*, 735 F.3d 528, 531 (7th Cir. 2013). However, under AEDPA, this court may not grant relief unless the challenged state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Pursuant to *Strickland v. Washington*, a successful ineffective assistance of counsel claim must show that (1) counsel's performance was deficient, meaning it fell below an "objective standard of reasonableness" informed by "prevailing professional norms" and (2) counsel's deficient performance prejudiced the petitioner, meaning that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 687–88, 694. However, in cases where a defendant has been effectively denied the right to counsel "altogether," prejudice may be presumed. *Id.* at 692. Such a circumstance was presented in *United States v. Cronic*, 466 U.S. 648, 659 (1984), decided the same day as *Strickland*. Smith contends that his counsel was so deficient as to trigger a presumption of prejudice.

The state responds by arguing that Smith both waived and procedurally defaulted on his *Cronic* claim by failing to raise it either before the federal district court or in state court. He urged those tribunals to employ the standard two-

pronged *Strickland* analysis, and did not argue that the courts should simply presume the existence of prejudice under *Cronic*. Smith, however, contends that *Cronic* simply presents a particularly egregious form of *Strickland* violation, and that a citation to *Strickland* impliedly incorporates the *Cronic* standard as well. He further asserts that the state court of appeals should have applied the presumption of prejudice once it found that "[d]efense counsel did not, for all practical purposes, mount a defense on Smith's behalf."

To avoid waiver on appeal, a party must "adequately present an issue to the district court" first. *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010). The requirement for preserving a constitutional claim for habeas review is similar: a petitioner must show that he "fairly presented [the] claim to the state judiciary." *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001). In *Ellsworth* we laid out four factors for determining whether the petitioner has avoided default: "1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Id.*

The Fifth Circuit has on at least one occasion distinguished between a *Strickland* claim and a *Cronic* claim. *See Hopper v. Dretke*, 106 F. App'x 221, 228 n.25 (5th Cir. 2004) (considering a *Strickland* claim but finding a *Cronic* argument waived). The Eighth Circuit has held in *Wenmark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003), that a *Strickland* claim did not

adequately raise an argument to extend the "rule of pre-sumed prejudice," enunciated in *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980), that applies when a lawyer representing multiple defendants suffers a conflict of interest that ad-versely affects his performance. The state urges us to like-wise conclude that, because Smith argued that Cupp's defi-cient performance prejudiced him, he waived any argument that prejudice should be presumed. But of course, Smith seeks not to break new ground but instead to simply have the rule in *Cronic* applied to his case. And the state does note that *Strickland* itself cited *Cronic* as an example of an attor-ney's constitutionally deficient performance: "In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Strickland*, 466 U.S. at 692 (citing *Cronic*, 466 U.S. at 659). This at least suggests that *Cronic* describes merely a subset within the universe of *Strickland* claims that includes "the most extreme instances of lawyerly incompetence." *Barrow v. Uchtman*, 398 F.3d 597, 603 n.4 (7th Cir. 2005). Smith contends that requiring a peti-tioner to cite both cases elevates form over substance.

Fortunately, we need not decide the thorny issue of whether the *Cronic* issue was fairly presented in this case. Whether or not Smith waived his *Cronic* contention, it lacks merit. And it certainly cannot meet the exacting AEDPA standard. The Supreme Court in *Strickland* limited the pre-sumption of prejudice to cases involving "[a]ctual or con-structive denial of the assistance of counsel altogether." 466 U.S. at 692. This includes, for example, "claims based on state interference with the ability of counsel to render effec-tive assistance to the accused." *Id.* at 683. In *Cronic* the Court explained that presuming prejudice would be appropriate in

the face of a "complete denial of counsel" or denial at a "critical stage" of the litigation. 466 U.S. at 659. The presumption would also be triggered if counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," or if, due to the timing of the trial or other factors, "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is [] small." *Id.* at 659–60. In sum, the presumption is appropriate where "[p]rejudice … is so likely that case-by-case inquiry into prejudice is not worth the cost." *Strickland*, 466 U.S. at 692. We have observed that the "*Cronic* exception is exceedingly narrow." *Miller v. Martin*, 481 F.3d 468, 472 (7th Cir. 2007), and the Supreme Court has reiterated that "the attorney's failure to test the prosecutor's case … must be complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002).

Cupp's performance does not meet this high bar. He did not abandon Smith during the proceedings, nor did the state interfere with his defense. At one pretrial hearing, Cupp and the trial judge went so far as to allow Smith to file his desired motions and take the stand to essentially argue on his own behalf. Cupp cross-examined the victim at trial and offered a self-defense theory of the case. It is true that Cupp's closing statement was equivocal and perfunctory to the point of being useless. But against the overwhelming weight of the state's evidence, he did not have many promising options. Considering prejudice, or its absence, is particularly important when a lawyer's deficient representation is at least in part influenced by the utter weakness of the defendant's case.

This situation is therefore readily distinguishable from *Barrow*, which Smith cites as an example of deficient repre-

sentation that came "perilously close to triggering" a presumption of prejudice. 398 F.3d at 603 n.4. Barrow's attorney failed to put on any evidence in his defense due in part to his "misunderstanding of Illinois law." *Id.* at 601. Here, by contrast, Cupp attempted to elicit evidence supporting a potential claim of self-defense. And in any event we decided that the prejudice presumption would have been inappropriate in *Barrow* because "counsel's failure was not complete, but occurred 'at specific points' in the proceeding." *Id.* at 603 n.4 (quoting *Bell*, 535 U.S. at 686). Likewise, Cupp did not act to deny Smith of his representation "altogether," and therefore the state court of appeals made no error in declining to presume prejudice under *Cronic*. Although he did not mount much of a defense, Cupp did subject the state's case to some meaningful adversarial testing during his opening statement and his cross-examination of the victim. The *Cronic* presumption is inappropriate here.

Consequently, we could not find that the state court unreasonably misapplied the law in declining to presume prejudice, and we may not grant habeas relief on that ground. The state court of appeals was not compelled to apply *Cronic* once it found that Cupp essentially failed "to mount a defense" on Smith's behalf. The court was no doubt justifiably critical of Cupp's performance, but it did not find that he had abandoned his client, absented himself from the case, or so egregiously failed his duty to represent Smith that prejudice should be presumed. That the court did not consider it appropriate to presume prejudice is borne out by the fact that it went on to find none.

As to Smith's ordinary *Strickland* claim, we agree with the state court of appeals that Cupp's assistance was substantial-

ly deficient, and that it fell far short of acceptable standards of professional conduct for defense counsel. The state wisely does not argue otherwise. Cupp's cross-examination of Fisher ended after only a few questions, even when Fisher's testimony opened the possibility that he had threatened Smith and put him in danger. Cupp entirely failed to cross-examine any other witness, or call witnesses of his own. This is particularly troubling in light of Smith's statement during trial that he wanted to call several individuals to the stand. We also do not know what sort of investigation Cupp undertook to learn the facts of the case, other than his apparent inquiry into Smith's conversation with Fisher the day before the attack. Smith persistently complained both before and during trial that Cupp failed to communicate with him, assist in his defense before trial, or file requested motions. Given the general lack of merit of those motions, we sympathize with Cupp's predicament, especially after Smith lodged a disciplinary complaint against him. But this strained attorney-client relationship adversely affected Cupp's performance.

Smith also points out that Cupp missed an inconsistency between the testimonies of two of the guards. One of the correctional officers, Rutland, testified that Smith wore gloves on each of his hands at the time he was handcuffed. But another one, Chlebowski, testified that one glove was in Smith's pocket, along with the other half of the pair of scissors used in the attack. He also claimed to have seen the other glove on the floor, although he observed this only after Smith had been handcuffed. Attentive counsel should have noticed this inconsistency and cross-examined Chlebowski about it. Although one minor discrepancy would not have significantly undermined the guards' combined testimony

that Smith attacked Fisher from behind with a half pair of scissors, Cupp should have investigated this issue and seen where it led.

Worst of all, Cupp failed to give a meaningful closing statement. An attorney is obligated to represent his client zealously. *See* Model Rules of Prof'l Conduct Preamble (2013). For a lawyer to leave a criminal verdict to the court's "discretion," without attempting to guide that discretion in his client's favor, is unacceptable. Cupp could have addressed the self-defense theory that he advanced in his opening argument and his brief cross-examination of Fisher. He could have reminded the court that the state bore the burden of proving every element of the offense beyond a reasonable doubt, that Fisher had declined to identify Smith as his attacker, or that the state had conspicuously declined to call to the stand any other inmate present at breakfast that day. If he had not failed to catch the inconsistency regarding whether or not Smith was wearing his gloves, he could have brought that issue to the court's attention as well. Instead, he offered a closing that failed to even ask for a favorable result and accomplished next to nothing.

We of course understand that an attorney may tailor his closing argument in a bench trial so as to skip some of the didactic lecturing and theatrical grandstanding that might occur in arguments before a jury. We also appreciate that the case against Smith was overwhelming. And the Supreme Court has recognized that in rare instances a state court may treat even a waiver of closing argument as a strategic choice. *See Bell*, 535 U.S. at 702 (holding that it was not "objectively unreasonable" for a state court "to deem counsel's choice to waive argument a tactical decision about which competent

lawyers might disagree"). For example, counsel may choose to forego a closing argument to prevent the prosecution from correcting a mistake or providing a damaging argument in rebuttal. *See Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) ("[I]t is well-settled that the decision to waive an opening or closing statement is a commonly adopted strategy, and without more, does not constitute ineffective assistance of counsel."). But none of these considerations can explain why Cupp decided to throw in the towel in this case. His closing should have been more than just a throat-clearing exercise.

That being said, we agree with the district court that Cupp's deficient performance did not prejudice Smith's case. One guard testified that he saw Smith walk up behind a seated Fisher and stab him. Another wrested a weapon from his hand while he was striking Fisher. A third identified the weapon as part of pair of scissors, and found the matching half in Smith's pocket. Fisher sustained stab wounds on his back and neck, consistent with being attacked from behind. Smith was detained and removed from the meal area immediately following the attack. An investigator found Smith's prison identification card amidst the blood spatter. Fisher testified that he had argued with Smith the day before the stabbing, thus establishing Smith's motive. Admittedly, this last piece of information was introduced during Cupp's cross-examination of Fisher, but we cannot fault him for pursuing a self-defense strategy. *See Gentry v. Sevier*, 597 F.3d 838, 851 (7th Cir. 2010) ("[S]econd-guessing strategic decisions in hindsight will generally not be a meritorious basis to find ineffective assistance of counsel."). We do fault him, however, for abandoning that line of argument midstream. And in any event, we agree with Smith that Cupp's

representation was deficient. But even a diligent attorney could have elicited that testimony, and it added to the state's already damning case.

In light of this overwhelming evidence, the precise location of Smith's gloves is a trivial concern. Smith makes much of the fact that no one correctional officer witnessed the entire incident, from Smith's approach until the discovery of the scissors under the table. But combined, overlapping testimony of three individuals that is consistent on all major issues provides powerful corroboration. Nor does Smith point to any potential evidence in his favor. Although he claims he had witnesses he wanted to call, he does not indicate what these individuals would have said, or how that evidence could have cast doubt on the eyewitness testimony of three correctional officers. This distinguishes this case from the one Smith cites, *Stitts v. Wilson*, 713 F.3d 887 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1282 (2014), in which an attorney failed to call alibi witnesses that could have undermined the state's case. Finally, even if Cupp had vigorously pursued a self-defense theory, it would have assuredly failed in light of the unprovoked nature of the attack. Smith has not advanced any argument as to how a self-defense argument could have prevailed. In short, he has offered us "no reason to believe that the trial would have come out differently" had his representation been satisfactory. *United States v. Kamel*, 965 F.2d 484, 499 (7th Cir. 1992). The state court did not err in finding a lack of prejudice and did not apply the law unreasonably.

In passing, Smith asserts that Cupp's representation at sentencing was deficient, but he does not seek resentencing. Nor has he offered any potential mitigating evidence or ar-

gument Cupp could have made to obtain a lower sentence. Smith does briefly assert that the *Cronic* presumption should apply to Cupp's conduct at sentencing. *See* Appellant's Br. at 27 & n.9. But the case on which he relies, *Miller v. Martin*, 481 F.3d 468 (7th Cir. 2007), is readily distinguishable. There counsel essentially sat out the sentencing proceedings after having informed the court that his client "[did] not recognize the validity of the trial or the authority of the Court to proceed to disposition at this time." *Id.* at 470 (quotation marks omitted). By comparison, Cupp participated in the sentencing proceeding. Although he did not offer a suggested sentence, neither did the prosecution. And any attempt to offer mitigating evidence may have prompted the state to highlight aggravating factors, such as Smith's lengthy criminal history. Cupp's efforts at sentencing amounted to "poor representation," not the sort of "non-representation … [that] triggers a presumption of prejudice." *Id.* at 473. This is true of Cupp's performance as Smith's counsel overall.

## III.    Conclusion

Because Smith's habeas petition lacks merit, we AFFIRM the decision of the district court.